# Exhibit A

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

*Click Here for Instructions*

Case No. 17 L 72

| CHRIS PETRI, YI LU LU, KEITH PETRI, LISA PETRI, AND KEITH KOTCHE | GEACOM, INC, a minnesota corporation, et al. | |
|---|---|---|
| Plaintiff(s) | Defendant(s) | |
| SERVE:<br><br>Name: **GeaCom, Inc. et al.**<br><br>Address: **394 Lake Avenue Suite 510**<br><br>City, State & Zip: **Duluth, MN 55802** | | File Stamp |

Amount Claimed **$4,122,505.00**

| | |
|---|---|
| Pltf. Atty **Burton A. Brown** | Add. Pltf. Atty _____ |
| Atty. Registration No. **0312045** | Atty. Registration No. _____ |
| Address **161 N. Clark St. Suite 1600** | Address _____ |
| City, State and Zip **Chicago, IL 60601** | City, State and Zip _____ |
| Attorney E-mail: **babrown@burtonabrown.com** | Attorney E-mail: _____ |

## SUMMONS

To the above named defendant(s):

☐ A. You are hereby summoned and required to appear before this court in room _____ of the _____ at _____ m. on _____ to answer the complaint in this case, a copy of which is hereto attached. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

☒ B. You are hereby summoned and required to file an answer in this case or otherwise file your appearance, in the Office of the Clerk of this Court, within 30 days after service of this summons, exclusive of the day of service. If you fail to do so, judgment or decree by default may be taken against you for the relief prayed in the complaint.

☐ C. You are further Notified that a dissolution action stay is in full force and effect upon service of this summons. The Conditions of stay are set forth on page two (2) of this summons, and are applicable to the parties as set forth in the statute.

TO THE SHERIFF OR OTHER PROCESS SERVER:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. In the event that paragraph A of this summons is applicable, this summons may not be served less than three days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date if paragraph B is applicable.

DATE OF SERVICE _____
(To be inserted by process server on copy left with the defendant or other person)

WITNESS, FEB 15 2017 _____ (date)

_____
Clerk of Court

Form 166-A (11/12)    Page 1 of 2          Original - Clerk      Copy - Defendant      Copy - Attorney

Case No. _____

## SUMMONS (CONT.)

I certify that I served this summons on defendants as follows:

(a) - (Individual defendants - personal)

By leaving a copy and a copy of the complaint with each individual defendant personally, as follows:

| Name of Defendant | Place of Service | Date of service |
|---|---|---|
| | | |
| | | |
| | | |

(b) - (Individual defendants - abode):

By leaving a copy and a copy of the complaint at the usual place of abode of each individual defendant with a person of his/her family, of the age of 13 years or upwards, informing that person of the contents of the summons, and also by sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his/her usual place of abode, as follows:

| Name of Defendant | Person with whom left | Date of service | Date of mailing |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

(c) - (Corporation defendants):

By leaving a copy and a copy of the complaint with the registered agent officer, or agent of each defendant corporation, as follows:

| Defendant corporation | Registered agent officer or agent | Date of service |
|---|---|---|
| | | |
| | | |
| | | |

(d) - (Other service):



_____
Signature

SERVICE FEES

Service and return _____ $ _____

Miles _____ ............................ _____

Total .......................................................... $ _____

☐ Sheriff of _____ County

☐ Special Process Server

Sheriff of _____ County

☐ By _____ , Deputy

☐ Special Process Server
(See Order of Appointment in file)

Form 166-A (11/12)    Page 2 of 2          Original - Clerk      Copy - Defendant      Copy - Attorney

JAMES MURPHY

Clerk of the Circuit Court
Kane County, IL

FEB 1 5 2017

FILED 075
ENTERED

**IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT**
**OF KANE COUNTY, ILLINOIS**

CHRIS PETRI, YI LU LU, KEITH PETRI, )
LISA PETRI, and KEITH KOTCHE )
             Plaintiff )
v. )
                                    )      Case No. 17 L 72 1
                                    )
GEACOM, INC., a Minnesota Corporation, )
and MAT JOHNSON, individually and as the )
President and CEO of GEACOM, and )
RALPH RAMANO, individually and as CFO )
and director of GEACOM. )
             Defendant )

## **COMPLAINT**

NOW COMES Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche

(collectively, "Plaintiffs") by and through its attorney, LAW OFFICES OF BURTON A.

BROWN, and complain against Defendant GeaCom, Mat Johnson, and Ralph Romano

(Collectively, "Defendants") as follows:

### **FACTS COMMON TO ALL COUNTS**

1. Plaintiff Chris Petri is a senior citizen and resident of Kane County, IL, and a minority shareholder of GeaCom.

2. Plaintiff Yi Lu Lu is a citizen and resident of Kane County, IL, and a minority shareholder of GeaCom.

3. Plaintiff Keith Petri is a citizen and resident of Kane County, IL, and a minority shareholder of GeaCom.

4. Plaintiff Lisa Petri is a citizen and resident of Kane County, IL, and a minority shareholder of GeaCom.

1

**NOTICE**
BY ORDER OF COURT THIS CASE IS HEREBY
SET FOR CASE MANAGEMENT CONFERENCE
BEFORE THE ABOVE NAMED JUDGE
ON _____ , AT _____ A.M., P.M.
FAILURE TO APPEAR MAY RESULT IN THE
CASE BEING DISMISSED OR AN ORDER OF
DEFAULT BEING ENTERED

5. Plaintiff Keith Kotche is a citizen and resident of Illinois, and a minority shareholder of GeaCom.

6. Defendant GeaCom, Inc. ("GeaCom") is a Minnesota corporation with its principle place of business in 394 South Lake Avenue, Duluth, Minnesota.

7. Defendant Mat Johnson is the President, Chief Executive Officer, director, and the controlling shareholder of GeaCom.

8. Defendant Ralph Romano is the Chief Financial Officer, director of GeaCom.

9. Plaintiff Chris Petri first made the acquaintance of Defendant Mat Johnson through a contract to supply GeaCom's LCD screens.

10. On early 2011, Defendant Mat Johnson approached Plaintiff Chris Petri promoting investment opportunity in GeaCom.

11. Defendant Mat Johnson stated GeaCom's pending sales and affirmative possibilities of incoming orders to induce Plaintiffs' investment before and after their initial equity investment in GeaCom.

12. Plaintiffs also found numerous pubic interview articles on the internet about Defendant Mat Johnson and GeaCom.

13. In his numerous public statements made in 2010, Defendant Mat Johnson affirmatively *"expects to produce 4,000 and 6,000 units per month for the first year beginning this fall and increasing based on demand."* With the price of "$10,000," such projection is equivalent to annual sales of $400,000,000 to $600,000,000. (see more details of Defendant Mat Johnson's public statements in Count III below).

14. Relying on the presentation and the interview articles found online, Plaintiff Chris Petri, Yi Lu Lu, Keith Petri, and Lisa Petri made their first equity investment in GeaCom and became the shareholders in February 2011.

15. Throughout 2011-2016, relied on Defendant Mat Johnson's recurring sales projections, statement of pending contracts, and public statements about the future of GeaCom, Plaintiffs continued to inject investment into GeaCom (see attached Exhibit A-1):

   A. Feb 28, 2011: Plaintiff Chris Petri invested $180,000 for 24,000 shares at $7.5 per unit.

   B. Feb 28, 2011: Plaintiff Keith Petri invested $180,000 for 24,000 shares at $7.5 per unit.

   C. Feb 28, 2011: Plaintiff Lisa Petri invested $180,000 for 24,000 shares at $7.5 per unit.

   D. April 23, 2012: Plaintiff Chris Petri invested $175,005 for 23,334 shares at $7.5 per unit.

   E. November 13, 2012: Plaintiff Chris Petri invested $ 567,500 for 113,500 shares at $5 per unit.

   F. August 16, 2013: Plaintiff Chris Petri invested $215,000 for 43,000 shares at $5 per unit.

   G. Sept 27, 2013: Plaintiff Chris Petri invested $165,000 for 33,000 shares at $5 per unit.

   H. Sept 27, 2013: Plaintiff Yi Lu Lu invested $165,000 for 33,000 shares at $5 per unit.

3

I. Jan 27, 2014: Plaintiff Chris Petri invested $215,000 for 43,000 shares at $5 per unit.

J. September, 2014: Plaintiff Keith Kotche invested $740,000 in GeaCom at $10 a share.

16. In 2013 and 2014, Plaintiff Chris Petri also made loans in the aggregate amount of $400,000 to help GeaCom's short term financial viability.

A. August 16, 2013: $100,000

B. June 13, 2013: $100,000

C. October 23, 2014: $100,000

D. In 2014: $100,000

17. On Feb 1st, 2015, the $400,000 loan was converted to 80,000 shares at $5 per unit (see attached Exhibit A-2).

18. In aggregate, Defendant Mat Johnson induced the Plaintiffs to invest more than $3,582,505 in GeaCom.

19. In 2016, Plaintiffs requested disclosure on the company's financial and sales status, but only got very limited responses and no full disclosure.

20. From the basic financial statements, Plaintiffs were shocked by the reported average annual sales of $15,000 a year, or equivalent to the sales of 1.5 devices a year. Plaintiffs also found that 100% of the pending sales and contracts affirmatively stated by Johnson were suspiciously never realized, especially with an average $2,000,000 annual expense. (see attached Exhibit B-1).

21. Defendant Mat Johnson and Ralph Romano refused to disclose material information about the details of all the anticipated, but never realized sales.

4

22. Realizing that the hopeful statement regarding sales and contracts were phantoms to induce Plaintiffs to invest in GeaCom, to protect their prejudiced minority shareholder's rights, and to protect other potential investors from this fraud, the Plaintiffs now bring this complaint to this Court.

## COUNT I – BREACH OF SUBSCRIPTION AGREEMENT

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count I as if set out verbatim.

2. Upon negotiation and mutual consent, the Plaintiff shareholders Chris Petri, Keith Petri, and Lisa Petri entered a Subscription Agreement (attached in Exhibit C-1 of this Complaint) with the Defendant company GeaCom on February 28, 2011, which specified:

    *"... so long as the Subscribers hold, in the aggregate, at least 50,000 shares of Common Stock, the Company covenants that, if the Company proposes to offer or sell any New Securities, the Company shall give [Offer Notice] to each Subscriber .... By notification to the Company within fifteen days after the Offer Notice is given, any Subscriber may elect to purchase or otherwise acquire, ...."*

3. The Plaintiff Chris Petri, Keith Petri, and Lisa Petri purchased 72,000 shares and delivered in the amount of $540,000 upon the execution of the Subscription Agreement on February 28, 2011.

4. Defendant company GeaCom has issued stocks for more than $800,000 between October 2015 and August 2016 (see changes of common stock equity in attached Exhibit B-2).

5. Plaintiff shareholders were never notified with such stock issuance in violation and the Defendants breached the Subscription Agreement.

6. In its clarification, the Defendant CFO Ralph Romano declined Plaintiffs shareholders' rights of notification (attached in Exhibit D-1 of this Complaint) relying on the Key Investor Agreement (attached in Exhibit C-2 of this Complaint) between the Defendant GeaCom, Mat Johnson, and Plaintiff shareholders Chris Petri and Li Yu Lu entered on Feb 1, 2015.

7. Despite the 2015 Key Investor Agreement's Right of Refusal clause contains more specificity on anti-dilution protection, it does not conflict with the Plaintiff shareholders' rights of notification as in the 2011 Subscription Agreement.

8. Moreover, the parties signed the 2015 Key Investor Agreement were different from the Parties that signed the 2011 Subscription Agreement so that the 2015 Key Investor Agreement does not void the 2011 Subscription Agreement as Defendant CFO Ralph Romano claimed.

9. Defendant Mat Johnson and Ralph Romano therefore breached the Subscription Agreement, and Plaintiff shareholders suffered damage for the dilution of share values because of lack of notification for Plaintiff shareholders to adjust their holding positions.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statements regarding pending contracts in the amount of $540,000 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano.

## COUNT II – BREACH OF FIDUCIARY DUTIES IN PREJUDICIAL TREATMENT TO PLAINTIFF SHAREHOLDERS

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count II as if set out verbatim.

2. Defendant Mat Johnson and Ralph Romano are directors and officers of GeaCom, they owe fiduciary duties to Plaintiff shareholders.

3. Johnson is the controlling shareholder of GeaCom, and the board of GeaCom is not disinterested.

4. After several years' good faith in the Defendant company GeaCom's management team, Plaintiff shareholders had no choice but to be concerned about the operation and the validity of statements shared by the Defendants.

5. Plaintiff shareholders had sought access to material information on the lost sales, but the rights of disclosure were declined by Defendant Ralph Romano, wrote in his email dated Aug 19, 2016 (attached in Exhibit D-2 of this Complaint):

   *"As a shareholder of roughly 10-15% your rights are yearly financials and shareholder meetings. You have received yearly financials and we have had a shareholder meeting every year and you have been invited. **Anything else is above and beyond.**"*

6. Ever since Plaintiff shareholders became minority owners of the GeaCom in 2011, no shareholder meeting invitations were ever received by the Plaintiff shareholders. Since Defendant Ralph Romano's employment in GeaCom in 2013 May (public record in LinkedIn, attached in Exhibit D-3 of this Complaint), no shareholder meeting invitations were ever received by Plaintiff shareholders.

7. Defendant CFO Ralph Romano had indicated in response for Plaintiff's request for information in his email dated Aug 19, 2016 (attached in Exhibit D-2 of this Complaint):

> "*By asking us for special information you are just distracting us from our efforts, so that information will stop.*"

8. Defendant CEO Johnson had further commented in his email to the Plaintiff shareholders:

> "*In my opinion you spend too much time scrutinizing for nefarious intent and sources of leverage (neither of which exist) and this is undermining the potential. … Lately, information provided to your group has not yielded as much benefit to the mission but 100% challenges.*" Dated on Oct 22, 2015 (attached in Exhibit D-4 of this Complaint).

> "*Fear and doubt are a coward's path. … If you want to take more unqualified pot shots and debate points that aren't real; you'll have to wait for my responses as I am too busy doing my duty to be prompt in reply to fruitless interactions.*" Dated on March 12, 2016 (attached in Exhibit D-5 of this Complaint).

9. The decision to not disclose requested material information to Plaintiffs, representing the second largest interest group, should not be motivated by Defendant Mat Johnson and Ralph Romano's self-interest.

10. With reported $40,000 annual fees (see attached Exhibit B-1) spent in accounting/attorney, Defendant Mat Johnson and Ralph Romano dictated the amount of information available to shareholders and their refusal to disclose information requested by Plaintiffs was a result of bad faith, oppressive or fraudulent abuse of discretion, which breached the duty of care and loyalty owed to the Plaintiffs.

8

11. As Directors of GeaCom, Defendant Mat Johnson and Ralph Romano failed to act with due care, good faith and loyalty to the best interests of minority shareholders.

12. By spending much of their time in making false statements to cover up the Ponzi scheme to defraud Plaintiff shareholders, the Defendant Mat Johnson and Ralph Romano also failed to reasonably develop the business, and therefore failed the duty of ordinary care owed to the shareholders. Moreover, the failure to exercise ordinary business care was evidenced by:

   A. No shareholder meeting invitations were ever sent to the Plaintiff shareholders.

   B. No detailed financial reports were ever prepared as requested by the shareholders.

   C. No production action beyond talks.

13. Pursuant to Minn.Stat. §§ 320A.751, subd. 1(b)(3), Plaintiff shareholders suffered harm from Defendant CEO Mat Johnson and CFO Ralph Romano's breach of fiduciary duty to disclose requested material information, and unfairly prejudicial treatment to the Plaintiff shareholders' request for material information.

14. Plaintiffs suffered feelings of mental distress and anxiety, stress and depression for their exploited minority shareholder's rights. Plaintiffs also suffered damage from lost investment opportunities because they were not able to timely adjust their investment positions.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statements regarding pending sales in the amount of $3,582,505 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano.

9

## COUNT III – BREACH OF FIDUCIARY DUTIES IN FRADULENT INDUCMENT

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count III as if set out verbatim.

2. Defendant Mat Johnson and Ralph Romano used affirmative statement regarding pending sales to fraudulently induce Plaintiff shareholders to inject equity investment in GeaCom without disclosing any material risks where no real orders were received.

3. Throughout all facsimiles to Plaintiff shareholders, only positive projections were discussed and no risks were ever disclosed.

4. In September 2014, Johnson made a sales presentation to Plaintiff Keith Kotche and Chris Petri to invest in GeaCom. In his sales presentation (see attached Exhibit E-1), the following PowerPoint were presented:

   *"Low-end target valuation for the company that we will attempt to attain in as short as **3 months and more likely within 6 months** by performing on the activities [Barclays] suggests for reducing risk and hitting or exceeding the roughly **½ billion estimate.**"*

5. Relying on the presentation, Kotche invested $740,000 in GeaCom at $10 a share.

6. Only after the investment, Plaintiffs then realized there were no associated risks mentioned in the sales pitch.

7. On his continuous sales pitches to Plaintiffs, the Defendant CEO Johnson made the following false representations about the investment opportunity to induce Plaintiffs' investment in GeaCom (original messages attached in Exhibit E-2 of this Complaint):

10

A. March 2012: backblock of people wanting to invest in GeaCom. Early sales are underway.

B. March 2012: thousands of orders from Essentia, QHR, Health Partners, University of Minnesota.

C. 2013: Landed a deal with a health Care Provider.

D. 2014: Health Department of Minnesota had dedicated money for purchase of Phrazer.

E. 2014: Homeland Security indicated orders are coming. Saint Lukes said Phrazer is a must buy. Area Ambulance will finalize the order.

F. 2014: Extremely large deal in Toronto, but we are GO.

G. 2014: Super busy tremendous progress.

H. 2014: Very aggressive, big investment opportunity.

I. 2015: Kreindler pounding at the door. Running out of inventory, need to order more.

J. 2015: Graham partners considering Acquire GeaCom for hundreds of millions.

K. 2015: University of MN has 5 and over 1000 unit potential; United Partners will go way over 3000 units; Essentia has 3000+ potential; Baylor scheduled first dozen by May; Garberville has 3 units will go to 50; St.Alphonsus has expansion potential around 250 units; CentraCare has placed an order; North probably with 500+ units.

L. 2015: Adams and Barclays 100% in. Booked the business, EPIC EMRs are backlogged production run is underway.

11

M. 2015: GeaCom is working on filling a several dozen of patents, we have 100m+ revenue opportunity.

N. 2016: prior to NDA execution, we will seek over $300M.

8. Concerning potential risks, Johnson further commented:

> "*Fear and doubt are a coward's path. ... If you want to take more unqualified pot shots and debate points that aren't real; you'll have to wait for my responses as I am too busy doing my duty to be prompt in reply to fruitless interactions.*" Dated on March 12, 2016 (attached in Exhibit D-5 of this Complaint).

9. The Defendant Mat Johnson and Ralph Romano's non-disclosure of material of information breached their fiduciary duties of loyalty and thereby fraudulently induced Plaintiffs' continuous investments in GeaCom.

10. As Directors of GeaCom, Defendant Mat Johnson and Ralph Romano failed to act with due care, good faith and loyalty to the best interests of minority shareholders.

11. Defendant Mat Johnson and Ralph Romano breached the fiduciary duty to disclose relevant risks in their fraudulent inducement of Plaintiffs' investment in GeaCom.

12. As a result of the Defendant Mat Johnson and Ralph Romano's breach of fiduciary duty, Plaintiff shareholders suffered from misinformed investment and loss of investment opportunities otherwise available.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statement regarding pending sales in the amount of $3,582,505 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano.

12

## COUNT IV – FRAUDULENT INDUCEMENT

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count IV as if set out verbatim.

2. The Defendant Johnson approached and sought equity investment from the Plaintiff shareholders in 2010.

3. To induce Plaintiffs' and other potential investor's investment in GeaCom, Johnson made various false public statements regarding to the future of GeaCom. The following is an exemplary list of public statements made by the Defendant (attached in Exhibit G of this Complaint):

   A. Article published on *RedOrbit* dated October 23, 2008, which reports that GeaCom had "*attracted major strategic relationships like Emerson Electronics, Medtronic, and Texas Instruments along with a seasoned executive team and advisory board.*" (Exhibit F-1).

   B. Article published on *TMC News* dated Feb 01, 2010, which quotes that Defendant CEO Mat Johnson "*expects to produce 4,000 and 6,000 units per month for the first year beginning this fall and increasing based on demand.*" (Exhibit F-2).

   C. Article published on *MedCityNews* dated Oct 13, 2010, which quotes interview with Defendant Mat Johnson "*hopes to sell the $10,000 device in the United States and foreign markets in 2011.*" (Exhibit F-3).

4. Relied on Defendant Mat Johnson's fraudulent presentation and public statements, Plaintiffs invested in GeaCom and became the minority shareholders of GeaCom.

5. As Directors of GeaCom, Defendant Mat Johnson owes fiduciary duties to Plaintiffs and Plaintiffs trusted Defendant Mat Johnson.

6. On his later sales pitches to Plaintiffs, the Defendant Mat Johnson again made the following false representations about the investment opportunity to induce Plaintiffs' investment in GeaCom (original messages attached in Exhibit E-2 of this Complaint):

   A. March 2012: backblock of people wanting to invest in GeaCom. Early sales are underway.

   B. March 2012: thousands of orders from Essentia, QHR, Health Partners, University of Minnesota.

   C. 2013: Landed a deal with a health Care Provider.

   D. 2014: Health Department of Minnesota had dedicated money for purchase of Phrazer.

   E. 2014: Homeland Security indicated orders are coming. Saint Lukes said Phrazer is a must buy. Area Ambulance will finalize the order.

   F. 2014: Extremely large deal in Toronto, but we are GO.

   G. 2014: Super busy tremendous progress.

   H. 2014: Very aggressive, big investment opportunity.

   I. 2015: Kreindler pounding at the door. Running out of inventory, need to order more.

   J. 2015: Graham partners considering Acquire GeaCom for hundreds of millions.

   K. 2015: University of MN has 5 and over 1000 unit potential; United Partners will go way over 3000 units; Essentia has 3000+ potential; Baylor scheduled first dozen by May; Garberville has 3 units will go to 50; St.Alphonsus has expansion

14

potential around 250 units; CentraCare has placed an order; North probably with 500+ units.

L. 2015: Adams and Barclays 100% in. Booked the business, EPIC EMRs are backlogged production run is underway.

M. 2015: GeaCom is working on filling a several dozens of patents, we have 100m+ revenue opportunity.

N. 2016: prior to NDA execution, we will seek over $300M.

7. To further induce Plaintiffs' investment, Defendant Mat Johnson made numerous false public statements regarding the investment opportunity. The following is an exemplary list of public statements made by the Defendant (attached in Exhibit G of this Complaint):

A. Article published on *RedOrbit* dated October 23, 2008, which reports that GeaCom had "*attracted major strategic relationships like Emerson Electronics, Medtronic, and Texas Instruments along with a seasoned executive team and advisory board.*" (Exhibit F-1).

B. Article published on *TMC News* dated Feb 01, 2010, which quotes that Defendant CEO Mat Johnson "*expects to produce 4,000 and 6,000 units per month for the first year beginning this fall and increasing based on demand.*" (Exhibit F-2).

C. Article published on *MedCityNews* dated Oct 13, 2010, which quotes interview with Defendant Mat Johnson "*hopes to sell the $10,000 device in the United States and foreign markets in 2011.*" (Exhibit F-3).

15

D.  Article published on *StarTribune* dated March 22, 2011, which states that Defendant company GeaCom *"will use T-Mobile network,"* quoting the company's COO Chris Butler. (Exhibit F-4)

E.  Article published on *Duluth News Tribune* dated April 11, 2011, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, *"the monthly production will increase from several hundred in June to several thousand by autumn with a goal of 15,000 by next year and 35,000 by the end of 2012."* At time of the report, Defendant Mat Johnson stated that GeaCom had *"**orders**"* to fill by June, and that GeaCom already had *"around 60"* jobs created. Defendant Mat Johnson also stated that *"GeaCom already has international sales reps and plans to open offices in England, Sweden and possibly Singapore. The device will be sprinkled around the globe within a year."* (Exhibit F-5).

F.  Article published on *Tech.MN* dated April 28, 2011, which reports an interview with Defendant CEO Johnson. According to Defendant Mat Johnson, *"[GeaCom] has raised $2.2M, and started taking orders for shipment,"* and *"[GeaCom] has 60 employees."* (interview available online at: *http://tech.mn/news/2011/04/28/catching-up-with-2010-minnesota-cup-high-tech-winner-geacom-video/* )

G.  Article published on *Tech.MN* dated Oct 4, 2011, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, *"[GeaCom] will go from 300 units in the market to as many as 10,000 by the end of year,"* and *"40,000 will be sold in 2012."* Moreover, *"GeaCom's customers are primarily*

*military hospitals, but some insurance companies are purchasing the device....*"(Exhibit F-6).

H. Article published on *Lackuna* dated May 15, 2012, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*the company expects to ship between 6,000 and 10,000 Phrazers this year.*" (Exhibit F-7).

I. Article published on *Tech.MN* dated Jul 9, 2012, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*the market is extremely hungry,*" but when asked about the number of sales, Defendant Mat Johnson answered "*GeaCom is setting up the manufacturing volume.*" (interview available online at: *http://tech.mn/news/2012/07/09/techdotmn-tv-duluth-geacom/*)

J. Article published on *Minnesota Business Magazine* dated February, 2013, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*Phrazer has been approved by the FDA...received certification from the PTCRB. ... By May, Phrazer in the U.S. market are expected to be seeing 7,000 patients a day, and by year's end that number will approach 50,000....GeaCom has landed a deal with a major health care provider as well as with a network carrier.*" Moreover, Defendant CEO Mat Johnson mentioned "*already more than 85% of [GeaCom's] business is outside of the United States, including in Asia, Africa, Latin America, and the Middle East.* (Exhibit F-8).

8. Relied these false sales projections and public statements made by the Defendant Mat Johnson through 2011-2015, the Plaintiffs were induced to make their equity investment in GeaCom.

9. The Defendant Mat Johnson and Ralph Romano ought to know the factual situations of GeaCom, with their access to information and control over the GeaCom. True facts and risks about the company were intentionally hidden by Defendant Mat Johnson and Ralph Romano.

10. The Defendant Mat Johnson ought to know the effects of these public statements in fund raising.

11. As Directors of GeaCom, Defendant Mat Johnson and Ralph Romano failed to act with due care, good faith and loyalty to the best interests of minority shareholders.

12. The Plaintiff shareholders suffered damages as they made their investment decision based on false information. They also suffered loss of investment opportunities that otherwise would be available.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statement regarding pending sales in the amount of $3,582,505 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano.

## COUNT V – EMBEZZLEMENT & WASTE OF CORPORATE ASSETS

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count V as if set out verbatim.

2. Plaintiff shareholders entrusted the Defendant directors and officers, and demanded:

   A. Best efforts in executing the development of pending sales as anticipated by the Defendant CEO Mat Johnson;

   B. Best efforts in securing the pending contracts anticipated by the Defendant CEO Mat Johnson.

18

3. Defendant Mat Johnson is the controlling shareholder and director of GeaCom, and the board is not independent and disinterested.

4. Defendant Mat Johnson breached his fiduciary duties owed to Plaintiff shareholders and fraudulently induced their investment, as alleged in Count II-IV above.

5. With reported $40,000 annual fees spent on attorneys and accountants, financial statements revealed highly suspicious unidentified expense items and unclassified current asset items to boost shareholder's equity.

6. In years of 2013-2016, annual expense increased from $1,800,000 to $1,950,000, while the average annual sales for the period were less than $30,000 (less than 3 devices a year at the price of $10,000 a unit).

7. Shareholder equity has been decreased at an annual rate about $1,800,000, but the pending sales stated by Defendant Mat Johnson were never actualized.

8. Amongst the other highly unreasonable expenses, $20,000 were spent on internet and telephone, and $20,000 on office supplies.

9. Asset items were buffed by the loss from previous years to boost the Plaintiffs' book value of equity investment.

10. By spending much of their time in making false statements to cover up the Ponzi scheme to defraud Plaintiff shareholders, the Defendant Mat Johnson and Ralph Romano also failed to reasonably develop the business, and therefore failed the duty of ordinary care owed to the shareholders. Moreover, the failure to exercise ordinary business care was evidenced by:

    A. No shareholder meeting invitations were ever sent to the Plaintiff shareholders.

    B. No detailed financial reports were ever prepared as requested by the shareholders.

C. No production action beyond talks.

11. The funds contributed Plaintiff shareholders were misappropriated and mismanaged, and wasted by Defendant Mat Johnson and Ralph Romano. The expenses were unreasonable and unfair, and were a result of bad-faith manipulation and waste of minority shareholders' assets.

12. Therefore, the Plaintiff shareholders suffered damage from the loss of their equity investment in GeaCom, and GeaCom suffered loss of corporate assets.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statement regarding pending sales in the amount of $3,582,505 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano.

## COUNT VI – SECURITIES ACT FRAUD

1. The Plaintiffs restate and realleged paragraph one (1) through twenty-two (22) of Facts inclusive as paragraph one (1) through twenty-two (22) of Count VI as if set out verbatim.

2. To raise funds, Defendant Mat Johnson filed Form 506 filings with the SEC on the following dates:

   A. May 16, 2009;

   B. Aug 16, 2010;

   C. Mar 24, 2011.

3. In anticipating potential interstate investors and to induce Plaintiffs' investments, Defendant Mat Johnson made numerous false public statements regarding GeaCom's

investment opportunity. The following is an exemplary list of public statements made by the Defendant (attached in Exhibit G of this Complaint):

A. Article published on *RedOrbit* dated October 23, 2008, which reports that GeaCom had "*attracted major strategic relationships like Emerson Electronics, Medtronic, and Texas Instruments along with a seasoned executive team and advisory board.*" (Exhibit F-1).

B. Article published on *TMC News* dated Feb 01, 2010, which quotes that Defendant CEO Mat Johnson "*expects to produce 4,000 and 6,000 units per month for the first year beginning this fall and increasing based on demand.*" (Exhibit F-2).

C. Article published on *MedCityNews* dated Oct 13, 2010, which quotes interview with Defendant Mat Johnson "*hopes to sell the $10,000 device in the United States and foreign markets in 2011.*" (Exhibit F-3).

D. Article published on *StarTribune* dated March 22, 2011, which states that Defendant company GeaCom "*will use T-Mobile network,*" quoting the company's COO Chris Butler. (Exhibit F-4)

E. Article published on *Duluth News Tribune* dated April 11, 2011, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*the monthly production will increase from several hundred in June to several thousand by autumn with a goal of 15,000 by next year and 35,000 by the end of 2012.*" At time of the report, Defendant Mat Johnson stated that GeaCom had "***orders***" to fill by June, and that GeaCom already had "*around 60*" jobs created. Defendant Mat Johnson also stated that "*GeaCom already has international sales reps and plans to open offices in England, Sweden and*

21

*possibly Singapore. The device will be sprinkled around the globe within a year."* (Exhibit F-5).

F. Article published on *Tech.MN* dated April 28, 2011, which reports an interview with Defendant CEO Johnson. According to Defendant Mat Johnson, "*[GeaCom] has raised $2.2M, and started taking orders for shipment,*" and "*[GeaCom] has 60 employees.*" (interview available online at:

   http://tech.mn/news/2011/04/28/catching-up-with-2010-minnesota-cup-high-tech-winner-geacom-video/ )

G. Article published on *Tech.MN* dated Oct 4, 2011, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*[GeaCom] will go from 300 units in the market to as many as 10,000 by the end of year,*" and "*40,000 will be sold in 2012.*" Moreover, "*GeaCom's customers are primarily military hospitals, but some insurance companies are purchasing the device....*"(Exhibit F-6).

H. Article published on *Lackuna* dated May 15, 2012, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*the company expects to ship between 6,000 and 10,000 Phrazers this year.*" (Exhibit F-7).

I. Article published on *Tech.MN* dated Jul 9, 2012, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*the market is extremely hungry,*" but when asked about the number of sales, Defendant Mat Johnson answered "*GeaCom is setting up the manufacturing volume.*" (interview available online at: http://tech.mn/news/2012/07/09/techdotmn-tv-duluth-geacom/)

J.  Article published on *Minnesota Business Magazine* dated February, 2013, which reports an interview with Defendant CEO Mat Johnson. According to Defendant Mat Johnson, "*Phrazer has been approved by the FDA...received certification from the PTCRB. ... By May, Phrazer in the U.S. market are expected to be seeing 7,000 patients a day, and by year's end that number will approach 50,000. ...GeaCom has landed a deal with a major health care provider as well as with a network carrier.*" Moreover, Defendant CEO Mat Johnson mentioned "*already more than 85% of [GeaCom's] business is outside of the United States, including in Asia, Africa, Latin America, and the Middle East.* (Exhibit F-8).

4. During the sales pitches to sell securities made to the Plaintiffs as shareholders in 2010~2015, the Defendant Mat Johnson made the following false representations to the Plaintiff shareholders (original messages attached in Exhibit E-2 of this Complaint):

A.  March 2012: backblock of people wanting to invest in GeaCom. Early sales are underway.

B.  March 2012: thousands of orders from Essentia, QHR, Health Partners, University of Minnesota.

C.  2013: Landed a deal with a health Care Provider.

D.  2014: Health Department of Minnesota had dedicated money for purchase of Phrazer.

E.  2014: Homeland Security indicated orders are coming. Saint Lukes said Phrazer is a must buy. Area Ambulance will finalize the order.

F.  2014: Extremely large deal in Toronto, but we are GO.

G.  2014: Super busy tremendous progress.

H. 2014: Very aggressive, big investment opportunity.

I. 2015: Kreindler pounding at the door. Running out of inventory, need to order more.

J. 2015: Graham partners considering Acquire GeaCom for hundreds of millions.

K. 2015: University of MN has 5 and over 1000 unit potential; United Partners will go way over 3000 units; Essentia has 3000+ potential; Baylor scheduled first dozen by May; Garberville has 3 units will go to 50; St.Alphonsus has expansion potential around 250 units; CentraCare has placed an order; North probably with 500+ units.

L. 2015: Adams and Barclays 100% in. Booked the business, EPIC EMRs are backlogged production run is underway.

M. 2015: GeaCom is working on filling a several dozen of patents, we have 100m+ revenue opportunity.

N. 2016: prior to NDA execution, we will seek over $300M.

5. All these public and private statements made to Plaintiffs contained material misrepresentation and omission, and they were the Defendants' devices to defraud the Plaintiffs and potential interstate investors in violation of Rule 10b-5 of the Exchange Act of 1934. As the truth reveals itself, none of the so-called pending sales were ever realized.

6. Defendant CEO Mat Johnson also failed his fiduciary duty to disclose relevant risks that were material for Plaintiff shareholders' investment decision. Throughout all facsimiles to Plaintiff shareholders, only positive projections were discussed and no risks were ever disclosed.

7. The exempted fund raising under form 506 does not exempt Defendant GeaCom and its CEO Mat Johnson from fraudulent inducement of interstate investment and sales of securities.

8. By relying on the deceptive devices, the Plaintiff suffered damage in making false investment and loss of their investment opportunities that otherwise available.

**WHEREFORE**, the Plaintiff Chris Petri, Yi Lu lu, Keith Petri, Lisa Petri, and Keith Kotche prays this court enter an order awarding damages to recover the investment induced by the Defendant's false statement regarding pending sales in the amount of $3,582,505 plus court costs against Defendant GeaCom, Mat Johnson, and Ralph Romano and rescind all Plaintiff shareholders' investment contracts with GeaCom.

Respectfully Submitted,

Attorney for the Plaintiffs

Burton A. Brown
Law Offices of Burton A. Brown
161 N. Clark St.
Suite1600
Chicago, IL 60601
Phone: (312) 236-5582
Attorney No.:0312045

# GROUP EXHIBIT A

# EXHIBIT A-1



**phrazer** ™

**by GeaCom, Inc**

Ph. 888-PHRAZER
888-747-2937
www.myphrazer.com

May 28, 2014

To: Chris Petri

Chris

Below is the detail of your GeaCom stock purchases:

February 28th, 2011
CA Petri, as trustee of the CA Petri Trust 24,000 shares @7.50 = $180,000
Keith Petri, as trustee of the Keith Petri Trust 24,000 shares @7.50 = $180,000
Lisa Petri, as trustee of the CA Petri Trust 24,000 shares @7.50 = $180,000

April 23rd, 2012
Chris Petri 23,334 shares @7.50 = $175,005

November 13th, 2012
Chris Petri 113,500 shares @5.00 = $567,500

June 18th, 2013
Roger Sandstrom 15,000 shares 10.00 = $150,000

September 27th, 2013
Chris Petri 33,000 shares @5.00 = $165,000
Li Yu Lu Petri 33,000 shares @5.00 = $165,000
Ted Pappas and Family 15,000 shares 10.00 = $150,000

January 27th, 2014
Chris Petri   43,000 shares @5.00  = $215,000

Total of 347,834 shares.

Best Regards,

Ralph Romano Jr.



394 South Lake Avenue Suite 700 Duluth, MN 55802



Ph. 888-PHR/
888-747-2
www.myphraz

**by GeaCom, Inc**

Dear Chris,

Below is the recap you asked me to send you regarding wires you sent to GeaCom.


1) November 12, 2012 for $417,500 + $150,000 = 567,500. This was for 113,500 options at $5.00 per share. We sent you stock certificate #78     


2) August 16, 2013 for $315,000.  This was for 43,000 options at $5.00 per share = $215,000 plus a loan for $100,000. We sent you stock certificate #92

3) June 13, 2014 for $100,000.  This was a loan.

4) October 23, 2014 for $100,000.  This was a loan.

5) Plus we received $100,000 loan that was not listed . This puts the total current loan at your $400,000.

394 Lake Avenue South Suite 510 Duluth, MN 55802 ● ● ● ● ● ● ● ● ● ● ● ● ●

**flickr**

**EXHIBIT A-2**



**by GeaCom, Inc**

Ph. 888-PHRAZER
888-747-2937
www.myphrazer.com



Effective February 1st 2015, GeaCom agrees to convert Chris Petri's loan of $400,000 to common stock at $5.00 per share, which is 80,000 shares. This makes the previous note agreement paid in full and satisfies all terms related in the note.

Chris Petri

Mat Johnson
GeaCom, Inc.



flickr

# GROUP EXHIBIT B

# EXHIBIT B-1

GeaCom, Inc.
Income Statement
For the Year Ended 2016

| | |
|---|---:|
| Sales | 79,200 |
| | |
| Expenses | |
| Wages | 935,400 |
| Wage Taxes | 77,900 |
| Health and Dental Insurance | 74,800 |
| Software Development | 246,900 |
| Rent | 187,300 |
| Travel | 92,500 |
| Attorney & Accountant | 43,400 |
| Business Insurance | 36,000 |
| Internet & Telephone | 19,000 |
| Language/Video Actor | 23,000 |
| Office Supplies | 20,900 |
| Device Connection | 17,200 |
| Postage and Delivery | 10,400 |
| Depreciation Expense | 47,900 |
| FCC/FDA/HIPPA  Etc | 7,100 |
| Hardware | 7,100 |
| Software | 6,500 |
| Other | 15,700 |
| Interest | 71,200 |
| Total Expenses | 1,940,200 |
| | |
| Net Income | (1,861,000) |

GeaCom, Inc.
Profit and Loss
January – December 2015

|  | Total |
|---|---|
| Sales | $20,000.00 |
|  |  |
| Expenses |  |
| Wages | 864,000.00 |
| Wage Taxes | 69,000.00 |
| Benefits | 52,000.00 |
| Legal & Accounting | 15,000.00 |
| Business Insurance | 26,000.00 |
| Rent | 215,000.00 |
| Depreciation Expense | 30,000.00 |
| Software Development | 210,000.00 — |
| Travel | 83,000.00 |
| Device Connection | 25,000.00 |
| Software | 45,000.00 — |
| Office Supplies | 22,000.00 |
| Internet | 11,000.00 — |
| Telephone | 12,000.00 — |
| Hardware | 10,000.00 |
| Interest | 87,000.00 |
| Bank Charge | 21,000.00 |
| Total Expenses | $1,797,000.00 |
| Net Income | ($1,777,000.00) |

# GeaCom, Inc.
## Preliminary Expenses
### January - December 2014

| Expenses | |
|---|---|
| Wages | 780,000 |
| Wages Taxes and Benefits | 150,000 |
| Hardware/Software/Content | 310,000 |
| Rent | 170,000 |
| Demos | 110,000 |
| Sales & Marketing | 60,000 |
| Interest | 50,000 |
| Depreciation Expense | 50,000 |
| Accountant/Attorney | 40,000 |
| Travel | 40,000 |
| Business Insurance | 30,000 |
| Other | 40,000 |
| **TOTALS** | **1,830,000** |

# EXHIBIT B-2

**EXHIBIT A**
**BALANCE SHEETS**
**As of May 31, 2013**
**(Unaudited)**

**ASSETS**

Current Assets

| | |
|---|---|
| Cash | $154,529 |
| Accounts Receivable | $4,800 |
| Total Current Assets | $159,329 |
| | |
| Net Fixed Assets | $18,019 |
| | |
| Other Assets | |
| Patents | $103,901 |
| Deferred Research & Development | $2,342,164 |
| Total Other Assets | $2,446,065 |
| | |
| TOTAL ASSETS | $2,623,413 |

**LIABILITIES AND EQUITY**

Current Liabilities

| | |
|---|---|
| Accounts Payable | $212,303 |
| Other Current Liabilities | $5,996 |
| Total Current Liabilities | $218,299 |
| | |
| Loan from shareholders | $221,752 |
| | |
| Total Liabilities | $440,051 |
| | |
| Equity | |
| Common Stock | $4,182,528 |
| Retained Earnings | ($1,797,908) |
| Current Year Net Income (Loss) | ($201,258) |
| Total Equity | $2,183,362 |
| | |
| TOTAL LIABILITIES AND EQUITY | $2,623,413 |

## EXHIBIT A
## Balance Sheet
As of April 30, 2014

| | |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Cash | $96,875 |
| Inventory | $344,660 |
| **Total Current Assets** | $441,535 |
| | |
| **Net Fixed Assests** | $151,290 |
| | |
| Other Assets | |
| Patents | $136,939 |
| Deferred Tax Credit | $2,225,000 |
| | |
| **Total Other Assets** | $2,361,939 |
| | |
| **TOTAL ASSETS** | $2,954,763 |
| | |
| **LIABILITIES AND EQUITY** | |
| Current Liabilities | |
| Accounts Payable | $232,965 |
| Short-Term Loan | $200,000 — MY LOAN TO THEM |
| **Total Current Liabilities** | $432,965 |
| | |
| Loan from Shareholders | $471,752 |
| | |
| **Total Liabilities** | $904,717 |
| Equity | |
| Common Stock | $5,382,833 |
| Retained Earnings | ($2,795,007) |
| Net Income | ($537,780) |
| | |
| **Total Equity** | $2,050,046 |
| | |
| **TOTAL LIABILITIES AND EQUITY** | $2,954,763 |

80 - Creation
130 - Burn /mo

**GeaCom, Inc.**
**Balance Sheet**
**As of October 9, 2015**

| | Total |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| US Bank | 206,327 |
| Accounts Receivable | 4,103 |
| Inventory | 289,599 |
| **Total Current Assets** | **500,029** |
| | |
| **Total Fixed Assets** | **178,819** |
| **Other Assets** | |
| Deferred Tax Credit 40% | 3,280,000 |
| Patent | 188,087 |
| **Total Other Assets** | **3,468,087** |
| **TOTAL ASSETS** | **4,146,935** |
| | |
| **LIABILITIES AND EQUITY** | |
| **Liabilities** | |
| Accounts Payable | 32,261 |
| Accrued Interest | 22,000 |
| Accrued Payroll | 9,000 |
| Erickson/Lewis Conv Loan 1/16 | 200,000 — *Th senior Lewis* |
| **Total Current Liabilities** | **263,261** |
| | |
| **Long-Term Liabilities** | |
| Erickson/Lewis Conv Note 2017 | 350,000 |
| Hausman Conv Note 2018 | 149,359 |
| Physio Group Note 2018 | 300,000 |
| **Total Long-Term Liabilities** | **799,359** |
| **Total Liabilities** | **1,062,620** |
| **Equity** | |
| Common Stock | ✓ 7,971,832 |
| Retained Earnings | (3,534,206) |
| Net Income | -1,353,311 |
| **Total Equity** | **3,084,315** |
| **TOTAL LIABILITIES AND EQUITY** | **4,146,935** |

**GeaCom, Inc.**
**Balance Sheet**
**As of September 1, 2015**

|  | Total |
|---|---|
| **ASSETS** | |
| **Cash** | 141,035 |
| **Accounts Receivable** | 9,495 |
| **Inventory** | 241,162 |
| **Total Current Assets** | **391,692** |
| | |
| **Fixed Assets** | 278,300 |
| | |
| **16100 Accumulated Depreciation** | -109,822 |
| **Total Fixed Assets** | **168,479** |
| | |
| **Other Assets** | |
| **Patent** | 181,456 |
| **Deferred Tax Credit 40%** | 3,050,000 |
| **Total Other Assets** | **3,231,456** |
| **TOTAL ASSETS** | **3,791,627** |

**LIABILITIES AND EQUITY**

| | |
|---|---|
| **Accounts Payable** | 104,454 |
| **Romano short term note** | 35,000 |
| | |
| **Erickson/Lewis Conv Loan 2016** | 200,000 |
| **Richards Short Term Note** | 60,500 |
| **Accrued Interest** | 21,000 |
| **Total Current Liabilities** | **420,954** |
| | |
| **Long-Term Liabilities** | |
| | |
| **Erickson/Lewis Conv Note 2017** | 350,000 |
| **Hausman Conv Note 2018** | 149,359 |
| **Physio Conv Note 2018** | 200,000 |
| **Total Long-Term Liabilities** | **699,359** |
| **Total Liabilities** | **1,120,313** |

*Handwritten: 1,000,000 Debt*

| | |
|---|---|
| **Equity** | |
| **Common Stock** | 7,621,833 |
| **Retained Earnings** | -3,764,207 |
| **Net Income** | -1,186,311 |
| **Total Equity** | **2,671,315** |
| **TOTAL LIABILITIES AND EQUITY** | **3,791,627** |

GeaCom, Inc.
Balance Sheet
As of December 31, 2015

|  | Total |
|---|---|
| **ASSETS** | |
| Cash | 40,000.00 |
| Accounts Receivable | 2,000.00 |
| Inventory | 330,000.00 |
| Total Current Assets | $372,000.00 |
| | |
| Fixed Assets | 303,000.00 |
| Accumulated Depreciation | (125,000.00) |
| Net Fixed Assets | $178,000.00 |
| | |
| Other Assets | |
| Deferred Tax Credit 40% | 3,350,000.00 |
| Patent | 196,000.00 |
| Total Other Assets | $3,546,000.00 |
| TOTAL ASSETS | $4,096,000.00 |
| | |
| **LIABILITIES AND EQUITY** | |
| Accounts Payable | 151,000.00 |
| Accrued Payroll | 26,000.00 |
| Prepaid Sales | 11,000.00 |
| Short Term Note | 20,000.00 |
| Total Current Liabilities | $208,000.00 |
| | |
| Long-Term Liabilities | |
| Convertible Notes | 839,000.00 |
| Total Liabilities | $1,047,000.00 |
| Equity | |
| Common Stock | 8,291,000.00 |
| Retained Earnings | (3,464,000.00) |
| Net Income | (1,778,000.00) |
| Total Equity | $3,049,000.00 |
| TOTAL LIABILITIES AND EQUITY | $4,096,000.00 |

EXHIBIT A

GeaCom, Inc.
Unaudited Balance Sheet
As of May 20, 2016

**ASSETS**

| | |
|---|---|
| Cash | $113,000 |
| Accounts Receivable | $12,000 |
| Inventory | $385,000 |
| Total Current Assets | $510,000 |
| | |
| Net Fixed Assets | $182,000 |
| | |
| Other Assets | |
| Deferred Tax Credit 40% | $3,700,000 |
| Patent | $201,000 |
| Total Other Assets | $3,901,000 |
| | |
| TOTAL ASSETS | $4,593,000 |

**LIABILITIES AND EQUITY**

| | |
|---|---|
| Liabilities | |
| Accounts Payable | $355,000 |
| Accrued Payroll | $26,000 |
| | |
| Short Term Note | $170,000 |
| Total Current Liabilities | $551,000 |
| | |
| Long-Term Liabilities | |
| Long Term Note | $839,000 |
| Total Liabilities | $1,390,000 |
| | |
| Equity | |
| Common Stock | √ $8,756,000 ← ·785000 |
| Retained Earnings | -$4,892,000 |
| Net Income | -$661,000 |
| Total Equity | $3,203,000 |
| TOTAL LIABILITIES AND EQUITY | $4,593,000 |

# GROUP EXHIBIT C

# EXHIBIT C-1

# GeaCom, Inc.

COMMON STOCK

SUBSCRIPTION AGREEMENT AND LETTER OF INVESTMENT INTENT

THIS AGREEMENT, made effective this 28 day of *February*, 2011, between GeaCom, Inc., a Minnesota corporation (the "Company"), and each of the entities set forth on the signature page to this Agreement (collectively, the "Subscribers").

In consideration of the mutual promises contained herein, and other good and valuable consideration, the parties hereto agree as follows:

1.      Agreement of Sale.  The Company agrees to sell to each Subscriber, and each Subscriber agrees to purchase from the Company, the number shares of the Company's Common Stock, $.01 par value, set forth in the attached Exhibit A (the **"Shares"**) for $7.50 per Share.

2.      Payment of the Purchase Price.  Concurrently with the delivery of this Agreement, each Subscriber delivered a check directly to the Company in the amount set forth opposite its name in the attached Exhibit A, payable to the order of **"GeaCom, Inc."** in full payment for the purchase of the Shares.

3.      Representations and Warranties of the Company.  In consideration of each Subscriber's subscription for the Shares, the Company represents and warrants to each Subscriber as follows:

    (a)     Organization.  The Company is a duly organized and validly existing corporation under the laws of the State of Minnesota.

    (b)     Good Standing.  The Company is in good standing under the laws of the State of Minnesota, and there are no proceedings or actions pending to limit or impair any of its powers, rights and privileges, or to dissolve it.

    (c)     Corporate Authorization.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by proper corporate action of the Company.

    (d)     Valid Issuance.  Upon payment as set forth herein, the Shares issued to Subscriber will be validly issued, fully paid and nonassessable.

4.      Representations and Warranties of Subscribers.  In consideration of the Company's offer to sell the Shares, each Subscriber hereby represents and warrants to the Company as follows:

1 CAP

(a)     That Subscriber has received all requested information, has fully reviewed, and is familiar with the business and financial condition of the Company, and has also reviewed the Company's Confidential Private Placement Memorandum dated October 5, 2010 (the **"Memorandum"**), and any and all exhibits attached thereto. The Subscriber has also been provided with access to the Company's business plan dated September 15, 2010 (the **"Business Plan"**). The Subscriber further acknowledges that Subscriber has had adequate time and opportunity to review the Memorandum and Business Plan individually and with Subscriber's professional advisors, if any;

(b)     That Subscriber is in a financial position to hold the Shares for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of Subscriber's investment in the Shares;

(c)     That Subscriber, either alone or with the assistance of Subscriber's own professional advisors, has such knowledge and experience in financial and business matters that Subscriber is capable of reading and interpreting financial statements and evaluating the merits and risks of the prospective investment in the Shares;

(d)     That Subscriber has obtained, to the extent Subscriber deems necessary, professional investment advice with respect to the risks inherent in an investment in the Shares, and the suitability of an investment in the Shares in light of Subscriber's financial condition and investment needs;

(e)     That Subscriber believes that the investment in the Shares is suitable for the Subscriber based upon the Subscriber's investment objectives and financial needs, and the Subscriber has adequate means for providing for Subscriber's current financial needs and personal contingencies and has no need for liquidity of investment with respect to the Shares;

(f)     That Subscriber has been given access to full and complete information regarding the Company and has utilized such access to Subscriber's satisfaction for the purpose of obtaining information regarding the Company, and, particularly, Subscriber has either attended or been given reasonable opportunity to attend a meeting with representatives of the Company for the purpose of asking questions of, and receiving answers from, such representatives concerning the Company;

(g)     That Subscriber recognizes that the Company has only recently completed the development of its initial products, has no revenue and is in the development stage; has had no material commercial operations to date, has incurred an aggregate loss since inception and may need to obtain additional funds within approximately six (6) months from the date of the Memorandum beyond those offered hereby for the successful implementation of its business plan;

(h)     That Subscriber acknowledges that there is no minimum number of Shares that must be sold prior to the Company's access to the Subscriber's funds, that no escrow

2   CAP

agreement is in place, that the Subscriber's funds are being paid directly to the Company, and such funds are immediately accessible by the Company;

(i)     That Subscriber recognizes that an investment in the Shares is highly speculative, illiquid and involves a high degree of risk, including, but not limited to, the risk of a complete loss of Subscriber's investment in the Shares;

(j)     That the Subscriber certifies, under penalties of perjury, that the Subscriber is **NOT** subject to the backup withholding provisions of Section 3406(a)(i)(C) of the Internal Revenue Code of 1986, as amended. *(Note: You are subject to backup withholding if (i) you fail to furnish your Social Security number or taxpayer identification number herein; (ii) the Internal Revenue Service notifies the Company that you furnished an incorrect Social Security number or taxpayer identification number; (iii) you are notified that you are subject to backup withholding; or (iv) you fail to certify that you are not subject to backup withholding or you fail to certify your Social Security number or taxpayer identification number.)*

(k)     The Shares are being purchased for Subscriber's own account and for investment and without the intention of reselling or redistributing the Shares, and Subscriber has made no agreement with others regarding the Shares and Subscriber's financial condition is such that it is not likely that it will be necessary to dispose of the Shares in the foreseeable future.  Subscriber is aware that, in the view of the Securities and Exchange Commission, a purchase of the Shares with an intent to resell by reason of any foreseeable specific contingency or anticipated change in market values, or any change in the condition of the Company, or in connection with a contemplated liquidation or settlement of any loan obtained for the acquisition of the Shares and for which the Shares were pledged, would represent an intent inconsistent with the representations set forth above;

(l)     Subscriber is a bona fide resident of, and is domiciled in and received the offer and made the decision to invest in the Shares in the state set forth in Exhibit A hereof;

(m)     If an entity, Subscriber was not formed for the purpose of investing in the Shares; and

(n)     The Subscriber has completed, and hereby certifies to the accuracy of, the Accredited Investor representation attached as Exhibit B.

5.     <u>Investment Purpose in Acquiring the Shares</u>. Each Subscriber acknowledges that the Shares have not been registered under the Securities Act of 1933, as amended (the **"Securities Act"**), or applicable state securities laws and that such Shares will be issued to the Subscriber in reliance on exemptions from the registration requirements of the Securities Act and applicable state securities laws and in reliance on Subscriber's and the Company's representations and agreements contained herein. Each Subscriber is subscribing to acquire the

3 SA

Shares for the account of the Subscriber for investment purposes only and not with a view to their resale or distribution. Each Subscriber has no present intention to divide Subscriber's participation with others or to resell or otherwise dispose of all or any part of the Shares. In making these representations, each Subscriber understands that, in the view of the Securities and Exchange Commission, exemption of the Shares from the registration requirements of the Securities Act would not be available if, notwithstanding the representations of Subscriber, Subscriber has in mind merely acquiring the Shares for resale or distribution upon the occurrence or nonoccurrence of some predetermined event.

6.      <u>Compliance with Securities Act</u>. Each Subscriber agrees that if the Shares or any part thereof are sold or distributed in the future, Subscriber shall sell or distribute them pursuant to the requirements of the Securities Act and applicable state securities laws. Each Subscriber agrees that such Subscriber will not transfer any part of the Shares without (i) obtaining an opinion of counsel satisfactory in form and substance to the counsel for the Company to the effect that such transfer is exempt from the registration requirements under the Act and applicable state securities laws or (ii) such registration.

7.      <u>Lock-Up Agreement</u>. The Subscribers have been informed that, in the event the Company conducts an initial public offering of its securities, registered under the Securities Act (the **"IPO"**), the underwriter in the IPO (the **"Underwriter"**) would likely believe that the success of the IPO would be furthered by the agreement of the holders of the Company's Common Stock to refrain from transferring any and all of their shares of Common Stock of the Company, now or hereafter owned, for a period following completion of the IPO. The Subscribers acknowledge that it is in each Subscriber's best interests that the Company successfully complete such an IPO and, in furtherance thereof, each Subscriber agrees as follows:

Pursuant to the Underwriting Agreement for the IPO between the Company and the Underwriter to be executed on or about the date of the effectiveness of the Registration Statement under the Securities Act on the appropriate form for the IPO, the Subscriber agrees not to offer, sell, or otherwise dispose of any unregistered securities of the Company owned by the Subscriber (whenever acquired) during the initial 180 day period following the IPO effective date. Further, in connection herewith, the undersigned agrees to the placement of a stop transfer order with the transfer agent of the Company and the delivery to the Underwriter of any other share lock up agreement consistent with the term of this Section 8 required by the Underwriter.

The Subscribers acknowledge that the Company is not representing or warranting that it will ever conduct an IPO, and each Subscriber further agrees that such Subscriber is purchasing the Shares of the Company with investment intent as further discussed in Sections 4, 5 and 6 hereof.

8.      <u>Restrictive Legend</u>. Each Subscriber agrees that the Company may place a restrictive legend on the documents representing the Shares containing substantially the following language:

4

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, have not been registered under any state securities laws, and are subject to a subscription and investment representation agreement. They may not be sold, offered for sale, or transferred in the absence of either an effective registration under the Securities Act of 1933, as amended, and under the applicable state securities laws, or an opinion of counsel for the Company that such transaction is exempt from registration under the Securities Act of 1933, as amended, and under the applicable state securities laws."

In addition, legends shall also be placed on the certificates noting the lock-up agreements contained in Section 7 hereof.

9.    <u>Stop Transfer Order</u>. Each Subscriber agrees that the Company may place a stop transfer order with its registrar and stock transfer agent (if any) covering all certificates representing the Shares.

10.    <u>Knowledge of Restrictions upon Transfer of the Shares</u>. Each Subscriber understands that the Shares are not freely transferable and may, in fact, be prohibited from sale for an extended period of time and that, as a consequence thereof, the Subscriber must bear the economic risk of investment in the Shares for an indefinite period of time and may have extremely limited opportunities to dispose of the Shares. Each Subscriber understands that Rule 144 under the Act permits the transfer of "restricted securities" of the type here involved only under certain conditions, including a minimum two-year holding period and the availability to the public of certain information concerning the Company, and that such conditions permitting sale may never occur.

11.    <u>Right of First Refusal</u>. The Company acknowledges that (i) the Subscribers are making a substantial investment in the Shares, and that (ii) the Subscribers are concerned regarding the potential dilution that may occur if the Company issues a substantial number of shares of its Common Stock, or securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), Common Stock, including options and warrants ("**Derivative Securities**"). In accordance therewith, so long as the Subscribers hold, in the aggregate, at least 50,000 shares of Common Stock (as adjusted for stock splits, stock dividends and similar recapitalizations), the Company covenants that, if the Company proposes to offer or sell any New Securities, the Company shall give notice (the "**Offer Notice**") to each Subscriber, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities. By notification to the Company within fifteen (15) days after the Offer Notice is given, any Subscriber may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of any Derivative Securities then held, by such Subscriber bears to the total Common Stock of the Company then outstanding (assuming full conversion and/or exercise, as applicable, of all Derivative Securities). In the event that one of the Subscribers determines not to purchase all of the New Securities offered to such Subscriber, the unsubscribed New Securities may be purchased by any other Subscriber under this Agreement

5  CAP

by notice within such fifteen (15) day period). For such purposes, (i) **"New Securities"** shall mean, collectively, any equity securities of the Company, whether or not currently authorized, as well as any rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities, in each cash excepting Excluded Securities, and **"Excluded Securities"**, shall mean (A) Common Stock or Derivative Securities that may be issued to employees, directors or consultants under an employee benefit plan approved by the Board of Directors, (B) shares of Common Stock or Derivative Securities issued pro rata as a dividend or distribution on Common Stock, (C) shares of Common Stock or Derivative Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board of Directors of the Company, or (D) shares of Common Stock, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors of the Company, (E) shares of Common Stock or Derivative Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided, that such issuances are approved by the Board of Directors of the Company. The covenants set forth in this Section 11 shall terminate, and be of no further force or effect, (i) immediately before the consummation of an IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Securities Exchange Act of 1934, or (iii) upon a merger or consolidation of the Company with or into any entity after which the holders of the voting equity securities of the Company immediately before the merger or consolidation hold les than 50% of the voting equity securities of the surviving corporation, or a sale of all, or substantially all, of the assets of the Company.

12.     Miscellaneous.

(a)     Notice. If any notification is required by law, such notification shall be deemed reasonable and properly given five (5) days following deposit in the United States Mail or one day following deposit in Federal Express or other reputable overnight service postage prepaid, addressed to the Company or the Subscriber at the address shown herein.

(b)     Invalidity of Particular Provisions. The Company and the Subscribers agree that the unenforceability or invalidity of any provision or provisions of this Agreement shall not render any other provision or provisions herein contained unenforceable or invalid.

(c)     Successors or Assigns. The Company and the Subscribers agree that all of the terms of this Agreement shall be binding on their respective successors and assigns, and that the term the "Company" and the term "Subscriber" as used herein shall be deemed to include, for all purposes, the respective designees, successors, assigns, heirs, executors and administrators. Notwithstanding the foregoing, this Agreement and the rights and obligations of the parties hereunder shall not be assignable, in whole or in part, by a Subscriber without the prior written consent of the Company.

6   CAP

(d)　Governing Law.　This Agreement shall be interpreted and governed under the laws of the State of Minnesota, other than its choice of law provisions.

(e)　Waiver.　Waiver of any default hereunder by a Subscriber shall not be a waiver of any other default or of a same default on a later occasion.　No delay or failure by a Subscriber to exercise any right or remedy shall be a waiver of such right or remedy and no single or partial exercise by a Subscriber of any right or remedy shall preclude other or further exercise thereof or the exercise of an other right or remedy at any other time.

(f)　Arbitration.　Any controversy or claim arising out of or relating to this Agreement, the Subscribers' purchase of the Shares or any breach of this Agreement, shall be settled by arbitration administered in Minneapolis, Minnesota by the American Arbitration Association in accordance with its Securities Arbitration Rules, and judgment on the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

(g)　Representations to Survive Delivery.　The representations, warranties, and agreements of the Company and of the Subscribers contained in this Agreement will remain operative and in full force and effect and will survive the payment of the purchase price pursuant to Section 2 above and the delivery of the certificates representing the Shares.

(h)　Entire Agreement.　This Agreement, including the Schedules and Exhibits attached hereto, constitutes the entire agreement of the parties relative to the purchase of the Shares by the Subscribers and supersedes any and all other agreements and understandings, whether written or oral, relative to the matters discussed herein.

(i)　Counterparts.　This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

*******************************************

*(signatures on next page)*

7 CAP

IN WITNESS WHEREOF, the Company and the Subscribers have executed this Subscription Agreement and Letter of Investment Intent as of the date first above written.

CA Petri, as Trustee of the CA Petri Trust, dated August 15, 1994

By _____
C. A. Petri

Keith Petri, as Trustee of the Keith Petri Trust, dated _Nov. 30 1996_

By _____
Keith Petri

Lisa Kay Petri, as Trustee of the Lisa Kay Petri Trust dated _Nov 30 1996_

By _____
Lisa Kay Petri

GEACOM, INC.

By: _____
Its President and CEO

8 CAP

**EXHIBIT A**
**PURCHASE AMOUNTS**

| Name and Address of Subscriber | Number of Shares Subscribed For | Amount Subscribed |
|---|---|---|
| CA Petri, as Trustee of the CA Petri Trust, dated August 15, 1994 Address: | 24,000 | $180,000.00 |
| Keith Petri, as Trustee of the Keith Petri Trust, dated _Nov 30 1996_ Address: | 24,000 | $180,000.00 |
| Lisa Kay Petri, as Trustee of the Lisa Kay Petri Trust, dated _Nov 30 1996_ Address: | 24,000 | $180,000.00 |

**TOTAL:** $540,000.00

# EXHIBIT C-2

# KEY INVESTOR AGREEMENT

This Key Investor Agreement (the "Agreement") is entered into effective as of February 1, 2015, by and between GeaCom, Inc., a Minnesota corporation (the "Company"), Mat M.K. Johnson individually ("Mat"), and Chris Petri and Li Yu Lu (collectively the "Investor").

## Recitals:

Whereas, the Investor and family have acquired 394,834 shares of Company common stock at between $5.00 and $7.50 per share (the "Investment"); and

Whereas the Company, Mat, and Investor desire to clarify the anti-dilution rights and co-sale rights to protect the Investor's Ownership Interest and ownership position in the Company pursuant to the terms and conditions set forth in this Agreement.

## Agreement:

NOW, THEREFORE, In consideration of the mutual promises and covenants provided for therein, the parties hereto agree as follows:

1.    <u>Anti-Dilution Period</u>. From the date hereof through the consummation of a Company sale (the "Anti-Dilution Period"), the Investor shall have the anti-dilution protection set forth in this Agreement.

2.    <u>Additional Issuances</u>. In the event that the Company shall, during the Anti-Dilution Period, issue additional equity securities of the Company, whether such equity securities be common stock or preferred stock, and including securities that are convertible into equity securities of the Company (such as stock options or warrants), the issuance of which would result in more than 4,000,000 shares outstanding (the "Dilutive Issuance"), excluding the 105,000 options acquired February 1, 2015 by the investor, then the Investor shall be entitled to receive from the Company, and the Company shall grant and issue to the Investor as soon as practicable following the Dilutive Issuance, common stock for the number of shares that are required to protect and maintain the Investor's Ownership Interest in the Company (the "Protective Grant"). For the purposes of this Section, a material reduction means any reduction in the Investor's Ownership Interest. However, the percentage will be determined by percentage ownership when 4,000,000 shares are sold.

3.    <u>Right of First Refusal</u>. Once the company reaches 3,800,000 in common stock sold, but not more than 4,000,000 sold, and it chooses to sell its stock at less than $10.00 per share, the Investor has the right of first refusal to purchase any or all of the shares offered for sale at the price being offered. The Investor will be notified via email and will have 15 days to exercise his right. If the Investor does not respond within 15 days, then he will be deemed to have waived the right of First Refusal, and the Company will proceed with the sale.

4.      Co-Sale Right.  If Mat receives an offer to sell shares he owns in the Company such that the sale would result in a reduction in the aggregate equal to or greater than ten percent of the shares Mat owns as of the date hereof, then Mat shall deliver to the Investor written notice that Investor shall have the right, exercisable upon written notice to Mat within 20 days after the receipt of the Co-Sale Notice, to participate in such Co-Sale on the same terms as Mat. If the Investor does not respond within 20 days, then Investor will be deemed to have waived the right of the Co-Sale for that sale provided Mat closes on said sale upon the terms outlined in the notice to Investor within 90 days from the date of notice to Investor. If the Investor desires to sell all or any portion of its shares together with Mat in the Co-Sale, Investor will provide written notice along with the number of shares Investor wishes to sell. If the purchaser agrees to purchase fewer than the number of shares that they wish to sell, then the allocation of shares will be based on the percentage of ownership. The exercise or non-exercise of the Co-Sale rights by Investor to participate in one or more sales of Co-Sales made by Mat shall not act as a waiver of said right or adversely affect Investors right to participate in subsequent sales by Mat.

5.      Complete Agreement.  This Agreement makes null and void all prior agreements of the parties.  Neither party is relying upon any representation or promise of the other party not set forth herein in entering into this Agreement.

6.      General.  This Agreement shall be governed under the laws of the State of Minnesota, without regard for its conflicts of law principles.  The rights granted herein, including but not limited to the rights of Anti-Dilution, Co-Sale, and the rights to exercise any and all options, shall transfer to the heirs, legatees, successors and assigns of Investor.  This Agreement is binding on the parties hereto and their respective successors, assigns and heirs.  This Agreement may be executed in counterparts.

Written notices will be sent to:

GeaCom
Attn: Ralph Romano
394 South Lake Ave, Suite 700
Duluth, MN 55802

Investor
Chris Petri
34W201 Army Trail Road
Wayne, IL  60184

[Signature page follows]

- 2 -

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be execute as of the date first above written.

GeaCom, Inc., a Minnesota corporation

By: _____
Name: _____
Title: _____

By:   Mat M.K. Johnson

By:   Chris Petri

By:   Li Yu Lu

*[Signature Page to GeaCom, Inc. Anti-Dilution Agreement]*

# GROUP EXHIBIT D

**EXHIBIT D-1**

Write the COMPLAINT.


-----Original Message-----
From: Ralph Romano <ralph.romano@geacom.net>
To: Kristelco <Kristelco@aol.com>
Cc: Mat Johnson <mat.johnson@geacom.net>; Kkotche <Kkotche@gmail.com>; kpetri
<kpetri@kristel.com>
Sent: Sat, Aug 13, 2016 12:29 am
Subject: Re: Visit

HI Chris,

Attached is the Key Investor Agreement that was signed by all parties on February 1, 2015. This
document contains the anti dilution clause and a right of first refusal that you are referring to.

Right of first Refusal: Paragraph 3 on the first page of the agreement states the following: Right of First
Refusal. Once the company reaches 3,800,000 in common stock sold, but not more than 4,000,000 sold. and it
chooses to sell its stock at less than $10.00 per share, the Investor has the right of first refusal to purchase any or all
of the shares offered for sale at the price being offered.

Anti-Dilution: Paragraph 2: States that if we sell more than 4,000,000 shares we have to issue additional
stock to you.


At this point Geacom has sold less than 3,800,000 shares ( see my May 26 email I sent to you) so neither
of these apply yet. When we reach 3,800,000 and if we offer the shares at less than $10 we will notify you
per terms of the agreement. Please note that since December 2012 you are the ONLY person to buy
stock at less than $10 per share. Finally, if we reach 4,000,000 shares, we will issue additional stock to
you at no charge per the agreement.

Chris, As a CFO I always like to get right to the bottom line. What do you want from us? We are working
very hard with limited resources and an innovative product. So do you want to help us move forward so
you can realize your maximum return on your investment. This would entail further investment or sales
leads. The tone of your email clearly shows you are angry with us. Do you want to just be mad at us,
even though we have provided everything we are required to, honored all our agreements and much
more? What can I do to satisfy your needs without it distracting us from our efforts to sell product and
raise capital. Ralph


Ralph Romano Jr.
EVP/CFO
GeaCom, Inc
218.740.4705


On Aug 10, 2016, at 5:10 PM, Kristelco@aol.com wrote:

Ralph, Mat.
Since Oct, stock for around 800 k in $ was sold.
My agreements of anti dilution and First right refusal were ignored. and
I received no notices of any kind.
Please provide me with all pertinent documentation about all those sales.!
CP

In a message dated 8/9/2016 4:35:33 P.M. Central Daylight Time,
ralph.romano@geacom.net writes:

**EXHIBIT D-2**

<KKotone@gmail.com>
Sent: Fri, Aug 19, 2016 3:01 pm
Subject: Re: Visit

Chris,

As a shareholder of roughly 10-15% your rights are yearly financials and shareholders meetings. You have received yearly financials and we have had a shareholders meeting every year and you have been invited. Anything else is above and beyond.

Now let's talk about above and beyond. You have an open invitation to come anytime to Duluth and you have cancelled a number of times. This latest request to visit is a perfect example. You requested a day to come to Duluth that I was going to be gone on vacation. I told you we were open the week before or the week after, but no response. Just complaints that I found a reason to cancel. Should I cancel out on going to my grandson's 3rd birthday party in Rapid City? I guess you feel I should.

1

We have gone above and beyond giving you information. We have given you detail listings of shareholders, financial etc. Do you have a right to be told the specifics about Cacadia, Barclays, etc. no you don't . Do you have the right to an explanations on our sales? No you don't. You want constant attention and information that distracts us from our business of selling and fund raising while adding no value.

Chris, you made the following statement: "We here believe there is no future for GeaCom and to trying raising more $ given the historical results, is troublesome."  It is obvious that you have lost faith in GeaCom, Mat and myself, and that is your right.

You have asked Mat and I to send you a "Multitude of answers and documents that will attest to the viability of Geacom." What would be the purpose of this. So you could be critical of what we have accomplished to date. Everything we send is just met with negative comments and accusations.

I guess that you feel that you were disrespected, that has not been the case. You are the only person to buy shares at less than $10 per share since late 2012, when you purchased shares at $5 per share in February 2015.  You were given 105,000 SARS in 2015 with the understanding that you would invest more money into GeaCom and you have not fulfilled your commitment  This put us in a bind and has hampered our sales process due to limited resources.

It is obvious that we both do not feel good about this relationship. We could continue to go back and forth but we have both made our points.

So this is what I would ask of you. Let's us continue to get sales and raise money as we have been doing By asking us for special information you are just distracting us from our efforts, so that information will stop. You will be sent periodic shareholder emails, we will continue to purchase screens from Kristel and we will follow all the written agreements in place with you. However, If you would like to contribute positively to GeaCom just let us know.

Ralph

Ralph Romano Jr.
EVP/CFO
GeaCom, Inc
218.740.4705

On Aug 14, 2016, at 4:09 PM, Kristelco@aol.com wrote:

Ralph, I agree somewhat that airing dirty laundry is useless as is useless to reverse the sorry state of events.
Yes we are mad and beyond for many reasons that you were not involved with

On Aug 14, 2016, at 4:09 PM, Kristelco@aol.com wrote:

Ralph, I agree somewhat that airing dirty laundry is useless as is useless to reverse the sorry state of events.
Yes we are mad and beyond for many reasons that you were not involved with.
But for the issues you were part of, try to rationalize this.
As the second largest Investor group, besides the stories of sales that did not materialize, why we are not told the truth and specifics for the lost opportunities with:
Cascadia
Barclays
Goldman
TA Associate, Abry, Nuance, .... at nauseam...
Wordlcom
Medtronic ETC ETC

Glorious reports, but no results, no explanations as to why

No Shareholder annual Meet.
Sending me, and probably others financial's with the Kristel payables omitted.
Asking for further participation with investment or Sales leads.???

Shareholders have rights. Well known responsibility.

2

You Know the answers but you and Mat keep all these from us
and expect devotion and cooperation.
The issues are now at a crossroad.

We tried to visit two or three times and maybe, just maybe find a reason to believe that there is a future. Always a conflict. I can pinpoint every time.
We here believe there is no future for Geacom and to try raising more $ given the historical results, is troublesome.

In one of your last emails, you said of the tremendous progress made recently. WHAT.?? WHERE.???
You have more units in inventory than units in the market.

This is not the doozy I was planning to send, but this certainly approximates one.

What do we expect?

file:///Users/Ralph/Documents/Key%20Investor%20Agreement.pdf.
Lets see what will come.
Chris

In a message dated 8/12/2016 3:45:01 P.M. Central Daylight Time,
ralph.romano@geacom.net writes:

Hi Chris,

I look forward to your response. I am hopeful that

# EXHIBIT D-3

://www.linkedin.com/in/ralph-romano-jr-4857789

**Linked in**

# Ralph Romano Jr
Executive Vice President / CFO at GeaCom, Inc.

United States    Machinery

**163**
connections

| | |
|---|---|
| Current | GeaCom, Inc. |
| Previous | Dane Technologies, Crown Iron Works Inc, ADDCO, Inc. |
| Education | University of Minnesota-Duluth |
| Websites | Company Website |

# View Ralph's full profile. It's free!
Your colleagues, classmates, and 400 million other professionals are on LinkedIn.

**View Ralph's Full Profile**

## Experience

### Executive Vice President / CFO
GeaCom, Inc.

May 2013 – Present (3 years 9 months)



### Chief Financial Officer / Chief Operating Officer
Dane Technologies

December 2009 – April 2013 (3 years 5 months)

       

# EXHIBIT D-4

----Original Message----
From: Mat Johnson <mat.johnson@geacom.net>
To: Chris Petri <kristelco@aol.com>
Sent: Thu, Oct 22, 2015 11:21 pm
Subject: Re: Loans and notes

Chris,

The Memorandum is a dozen or so pages summarizing the opportunity.  It is a highly confidential and controlled document (you know that though).  This Memorandum overviews the company and summarizes the market, IP, customers and opportunity.  For most it will be the first broad look into GeaCom.  The normal path is to send it out to 25 to 30 targeted buyers, hope to get 10 or so responses, try to whittle that down to 3 to 5 highly interested buyers and get a price drive.

You don't need to continue to try to assert your stock position as leverage.  Stock percentage doesn't equate to leverage.  Being an engaged, positive and helpful force with insights and resources to advantage the mission is all that it takes.  In my opinion you spend too much time scrutinizing for nefarious intent and sources of leverage (neither of which exist) and this is undermining the potential.  Every shareholder would like unlimited, continual information but it isn't productive, reasonable or possible.  Lately, information provided to your group has not yielded as much benefit to the mission but 100% challenges.  Essentially we're not functioning as well as we could or should.  Likely you think this is GeaCom's fault.

Each day at GeaCom has more work added, less available time, is experiencing rapidly reducing resources, has more thinly spread staff, puts more Phrazers in market, experiences more variables and less time to experiment with advocates.  Our success is important to you, you and your group has

1

resources, talent and insights that can benefit our shared interest.  I recognize your advocacy, ability, that you're a friend and that you're a little frustrated in finding difficulty applying assistance.  When you visit in a month or so we can address this further.  In the meantime GeaCom is experiencing tremendous advancement on all fronts (especially with customers).  I'll keep trying to improve this.  Thank you for your patients and effort.

—Mat MKJ

On Oct 21, 2015, at 9:35 PM, Chris Petri <kristelco@aol.com> wrote:

The Memorandum you will be sharing
Is most likely the Co. Announcement that it is for sale and not what Cascadia will be distributing,
Am I wrong?
We want to see what documents Cascadia will be issuing to prospective buyers.
We own almost 17% of the co. So it is hardly confidential info we would mismanage or misuse.
That is what we requested months ago when Cascadia signed.
The announcement you make
Is secondary.
Confirm our request.
C

Sent from my iPhone

On Oct 22, 2015, at 5:14 AM, Mat Johnson <mat.johnson@geacom.net> wrote:

Chris,

I've looked through our communications to understand your question

# EXHIBIT D-5

Sent from my iPhone

Begin forwarded message:

**From:** Mat Johnson <mat.johnson@geacom.net>
**Date:** March 12, 2016 at 12:17:39 AM GMT+8
**To:** Chris Petri <kristelco@aol.com>, Keith Kotche <keith@levatokotche.com>,
Keith Petri <kpetri@kristel.com>
**Subject: Please take the time to consider**

Gentlemen,

Right now as I type this and again, right now as you read this; know that our
Phrazers are in medical systems, engaging patients, performing never before
possible activities for people like us. These are fully validate and paid for Phrazers
performing real interactions without fail.

After years of struggling forward and building for this moment we are at a "make it
or break it" point. The company will get the last push of vital resources from its
investors and supporters, the company will rally across the gap to established
revenue growth or it will fall short of achieve a once in a lifetime opportunity. My
ability to convey the gravity of this moment, the strength of the opportunity, the
responsibility of shareholders/community and path to great success; coupled with
your ability to appreciate, accept and take positive action is absolutely vital and
urgent.

## THIS MARKET IS DIFFERENT

Our healthcare market space is in a state migration and turmoil due to the new
healthcare law completely changing performance policies and requirements and also
the result of the biggest recession in US history. Every US hospital has spent $100s
of millions or even over a billion on meeting new meaningful use requirements. All
hospitals have brand new departments and policies in place dictating what can and
cannot be connected to the record. The ability to assess and move acceptable
technology into play is immature, insecure, convoluted and frozen in panic. This is
an across the board issue that is particularly challenging to new products. Beyond
that challenge is a rapidly consolidating market that has systems on high alert. A dip
in security, brand stability or performance and a hospital is immediately vulnerable.
Nowhere is this more concerning than when patient interfacing and private records
are in play. Hospitals can't protect records and it is costing over $6bn annually:
http://www.nbcnews.com/tech/security/health-industry-cant-protect-your-records-
hackers-report-n355401 : Worth more than credit card:
http://www.reuters.com/article/us-cybersecurity-hospitals-
idUSKCN0HJ21I20140924. This is an introduction into the painful reality of what
we face with our market entry; now web search this, think hard on it, investigate
with medical experts and you'll see this is "the tip of the iceberg". In terms of our
entry and market, Phrazer isn't selling "at a snail's pace"; it is outperforming the
norm.

## HOW PHRAZER IS A WINNER

Phrazer is unquestionably the most important advancement in method and

2016 3 14

technology for general medical value in over 50 years but it also is at the most challenging point of entry. On pure method, design and performance, Phrazer achieves unprecedented acceptance and appreciation. Acquiring advocates and agreements to move forward is a near 100% successful endeavor for GeaCom which is testimony to the novel positioning and strength of our model. Price is not an issue. Performance is not an issue. Scaling is not an issue. Perceived competitors are not an issue. No method known, no product available and no business model offered stands in our way. What stands in-between GeaCom (team, shareholders, partners, us) and the success we've earned being fully achieved is a little time and a fraction more vital resources.



Copyright 2003-2006 Scott W. Ambler

GeaCom has the scope, features and functionality. The product is in the market achieving a 100% uptime, zero errors, unprecedented patient engagement and the highest overall quality performance. This is no BS; we have the pilot results, testimonials and ongoing measures of proof from validated 3rd parties. You could walk into several systems today and see proof first hand. With full FDA clearance, HIPAA clearance, established high security/redundancy servers, complete EMR integration, total infectious disease control support, never before possible language/literacy/culture/race/gender/age coverage and more; on the Iron Triangle, GeaCom meets the vital more challenging point. As for resources the company is starving. For time, we are nearly out. If GeaCom (you and us) is to succeed the resource and time issue must be addressed. With more fuel we can shorten time; we are at the cusp but without an immediate infusion, you may not see the potential. What will this be? A story of incredible success and courage or a story of tentativeness and what almost was.

HOW MUCH FURTHER

As for how close we are to breaking through despite the odds and challenge here is a snapshot on status:

HealthPartners Regions

Phrazer has been in service for over a year achieving record results in a long term pilot. This market space leader (largest US ACO) and a strong Phrazer referential customer is a showcase for our capabilities. With an ongoing contracted base of 20 units and a full EMR integration underway we anticipate expansion from readmissions to discharge, ER, Oncology, Urgent Care, GI and mental health. HealthPartners is featuring our progress in media, trade shows and market discussions. GeaCom anticipates a strong